## Barney *against* Sutton.

The seal of the justice is essential to the validity of the certificate of the probate of a deed: and record of a deed without such certificate is not constructive notice of the title conveyed thereby.
A history of a Connecticut title, and a settlement under it.

ERROR to the common pleas of *Luzerne* county.

This was an action of trespass by Hanover Barney and Caleb A. Townsend against Samuel Sutton, in which the parties agreed to consider the following facts as a special verdict:

That the plaintiffs hold the certified title by the compromising law of 1799, under sundry mesne conveyances; and have been, by themselves, or those under whom they claim, in the actual possession of the *locus in quo*, &c. for many years, to wit since issuing the certificate in 1805 ; and that the certificate issued in the common form, under the compromising law, without any reservation, conveying, upon the face of it, the absolute title : which, on the 3d of January 1809, was sold by order of the orphan's court to E. Blackman, and by him subsequently to the plaintiffs.

That previous to the granting or issuing of the certificate to the

[Barney v. Sutton.]

person under whom the plaintiffs hold, to wit on the 9th of May 1794, there was granted by the said Connecticut claimant to whom the said certificate issued, to those under whom the defendant claims, by deed recorded in Luzerne county, a right to enter on the said premises to search for, dig and carry away coal and other minerals, which was as follows:

"Know all men by these presents, that I, Joseph Hazard, of Pittson, in the county of Luzerne and commonwealth of Pennsylvania, for and in consideration of the sum of five shillings to me in hand paid by Dr William Hooker Smith of Pittson, in the county of Luzerne and commonwealth of Pennsylvania, have given, granted, bargained and sold, and by these presents do for ever bargain and sell unto the said William Hooker Smith, his heirs and assigns for ever, a privilege to search for and to dig and raise iron ore and stone coal, or any other mineral whatsoever on a certain lot of land lying in Pittson, known by number eight in the first division of lots in Pittson on which I now live, I having only half the privilege and property of ores and minerals in said town; and he said Smith, his heirs and assigns, shall have free liberty not only to dig and raise said ore from and out of the earth, but also shall have liberty of road and ways to carry away said minerals, where it will do the least hurt; but he said Smith is not to have the sole and'only privilege, so as to hinder said Joseph Hazard or his heirs from digging and collecting minerals off and from said land, and the said grantor and grantee are to have an equal right to dig and raise ores and minerals, but not so as to interfere with each other.   Dated, this 9th day of May, in the year of our Lord Christ 1794.

"JOSEPH HAZARD,   [L. S.].

"Signed, sealed and delivered in presence of Henry Barney, Celinda Baldwin."

Proved by subscribing witnesses, 29th of September 1794.

Recorded 12th October 1795.

The probate was not authenticated by the seal of the justice as appeared by the original deed.

It is also conceded that defendant, under his said deeds, on the 11th day of July, in the year 1814, did enter upon the said premises and dig and carry away coal; but was disturbed and hindered by the plaintiffs in the enjoyment of the above mentioned premises; and that the said defendant, on the 1st day of May 1830, did enter on the said premises, and against the consent of the plaintiffs, did dig and carry coal therefrom: and that the plaintiffs had no actual notice of the grant of the above named privilege or hereditament to the defendant, or those under whom he claims, at the time of purchasing the certificate title.

That the plaintiffs have not constantly exercised the right of digging coal on the premises, but did, more than twenty years ago, open a coal bed upon said premises, and have continued at several seasons to dig coal to supply the fire of a dwelling on the premises.

[Barney v. Sutton.]

And it is further conceded, that the holder of the deed of this privilege of digging coal, &c. conveyed, by deed dated 29th August 1811, to James and Sarah Sutton, and they, by deed dated 11th July 1814, assigned to the present defendant.

Opinion of the court (Scott, president).

The case stated involves the following considerations.

1. Whether Joseph Hazard had such an interest in the land or *locus in quo* as enabled him to grant such an estate as is conveyed by his deed of the 9th of May 1794?

2. Whether the certificate issued to Joseph Hazard, under the act of the 4th of April 1799, and its supplements, is conclusive against the defendant's claims?

3. Whether the record of the deed under which the defendant claims, was constructive notice of the defendant's title?

4. Whether the defendant has lost his right by *non user?*

Joseph Hazard claimed the land as a settler under a title derived from Connecticut. It becomes necessary, therefore, in answering the first inquiry, to take some notice of the Connecticut title, and to endeavour to ascertain the right of a settlement under it.

The colony of Connecticut claimed jurisdiction over this district of country, by virtue of a charter from Charles II., dated the 23d of April 1662.

The proprietaries of Pennsylvania claimed jurisdiction over the same territory, by virtue of a charter from the same Charles, dated the 4th of March 1661.

The charter of. Connecticut was granted to the people, and included in terms the right of pre-emption of all lands within its limits. In practice purchases from the Indians, by individuals and companies, were generally countenanced and confirmed by the government of the colony.

The charter of Pennsylvania was a grant to William Penn and his heirs. It contained no provision in relation to the right of pre-emption of lands. But from the practice which prevailed generally under charters granted by the crown, the right of pre-emption in the Penns was implied and in practice; the Penn family exclusively exercised this right within their chartered limits.

An association of a number of the inhabitants of Connecticut, called the "Susquehanna Company," purchased this district of country of the Six Nations of Indians, on the 11th of July 1754. In August 1762, two hundred emigrants from Connecticut commenced settlements on these lands, within what is called the Seventeen Townships, under grants from the "Susquehanna Company." These settlements were never abandoned, but were persisted in under the most discouraging and disastrous circumstances. The proprietaries of Pennsylvania obtained a deed of the same Indians for the same district of country, on the 5th of November 1768. No compass had been ever set, no tree marked, or settlement attempted, under the authority of Pennsylvania, prior to the purchase and settlement under

II.—E

[Barney v. Sutton.]

Connecticut. These interfering charters and purchases, and the settlement commenced under the "Susquehanna Company," were fruitful causes of dispute between Pennsylvania and Connecticut; and notwithstanding frequent attempts were made by the executive authority of Pennsylvania to drive the settlers from their possessions, they clung to their possessions, increased rapidly in numbers, and extended their improvements.

At the commencement of the revolution, settlements had been effected in most, if not all the seventeen townships ; and in many of them extensive improvements had been made. The settlers were a hardy, intelligent, brave and patriotic people. During the revolutionary struggle, neither the sufferings and privations which they endured, nor the menace of the executive authority of Pennsylvania, could drive them from their settlements; nor could the offers of British gold tempt them to abandon their country, or the common cause of liberty and independence in which they were engaged. They had become so numerous, that they furnished nearly one thousand men for the regular service. They did still more. They sustained single handed, for more than three years, a frontier war, during the most gloomy period of the revolution ; and successfully repelled an enemy, "whose known mode of warfare spared neither age, nor sex, nor condition." On the 3d of July 1778, they were attacked by a numerous body of Indians, British and Tories, and in one disastrous battle, nearly the whole settlement were reduced to widowhood and orphanage.

The feeble remains which escaped, soon mustered and returned to the settlement, and until the close of the war, presented a barrier to the incursions of the savage foe.

This is a mere skeleton of the early history of this settlement. It would require a volume to fill it up. But enough has been noticed to satisfy any one not blinded by interest or prejudice, of the equitable claims of those people. They came into possession under colour of title, such a title too as they honestly believed to be good ; and in which they were induced to confide, by a government claiming jurisdiction over the territory. Was this circumstance nothing as a ground of equity ? Were the improvement and possession of the country nothing ? Were the sacrifices and sufferings and privations of the people in defence of the country, and in the common cause, nothing ?

Are such a people to be considered outlaws ? To this last question I adopt the answer of the late Chief Justice in the case of Satterlee v. Matthewson. "God forbid ! they are not to be so considered." Considerations like these have uniformly been regarded as sufficient in Pennsylvania to ground an equity. The principle has been carried further. Our statute books, and the decisions of our courts, furnish numerous instances where like considerations have been deemed sufficient grounds of equity in favour of those who had taken possession of lands without title or colour of title, and in favour of

those who had taken possession in violation of the positive enactments of the legislature; as in the case of lands not purchased of the Indians.

The question of jurisdiction to this disputed territory was finally submitted to commissioners appointed by congress, who met at Trenton on the 30th of December 1782, and unanimously decided, that the state of Connecticut had no right to the land in controversy; and that the jurisdiction and pre-emption of all lands lying within the chartered bounds of Pennsylvania, and then claimed by Connecticut, did of right belong to the state of Pennsylvania.

The commissioners, having assumed upon themselves the decision of the question of title (a question not expressly submitted to them), recommended the case of the settlers under the "Susquehanna Company" to the favourable consideration of the legislature of Pennsylvania, upon the ground of the equity of the claim.

On the 13th of March 1783, a little more than three months after the decision at Trenton, the legislature of Pennsylvania, in the spirit of the recommendation of the commissioners, passed an act to stop all suits and process for dispossessing the Connecticut settlers.

On the 15th of September 1784, many of the settlers having been dispossessed by a force collected by the Pennsylvania claimants or their agent, an act was passed, directing summary proceedings to restore their possessions, and expressly providing, that no certiorari or other writ, issuing out of the supreme court, should supersede or delay such proceedings.

In the same year, the council of censors urged upon the legislature the justice and equity of the claims of the settlers from Connecticut, and censured in no measured terms the general system of measures which had been pursued by the executive authority of the state in relation to the settlers.

The proceeding of the council of censors, with the recommendation of the commissioners at Trenton, and a general sympathy and feeling of compassion which began to prevail in favour of this suffering people, gave birth to the famous confirming law of the 28th of March 1787. This act confirmed the Connecticut settlers in their possessions, and compensated the Pennsylvania claimants, in lands. It was suspended by the *legislature* in 1788, and finally repealed by an act of the 1st of April 1790. The preamble to the repealing law assigns as the reason for its repeal, that it was unconstitutional.

The circuit court of the United States reiterates the opinion in 1795, five years after its repeal, in the case of Vanhorns *v.* Dorrance. The law was repealed because it was unconstitutional, said the legislature; because it compensated the Pennsylvania claimants in land and not in money, said the circuit court of the United States; not upon the ground, that the Connecticut settlers had no equitable claims for it. It is worthy of remark, that the legislature, in the same repealing law, seemed to recognize a right in the Connecticut settlers to their possessions. Upon what other grounds was the ex-

[Barney v. Sutton.]

traordinary power assumed of reversing judgments in ejectment obtained against them by the Pennsylvania claimants, and of compelling the plaintiffs to institute new suits to try their rights.

Previous to the decision at Trenton, the Connecticut settlers never did stand in the situation of trespassers with a full knowledge of their want of title, nor could they be regarded as intruders upon the territory, or violators of the laws of Pennsylvania with a full knowledge of her right of jurisdiction ; for both title and jurisdiction were in dispute between two independent governments. And notwithstanding they had, from the beginning, exercised acts of self-government, independent of every other community, the government of Pennsylvania did not seem to regard them as guilty of a *criminal* intrusion upon their territory, or of a criminal violation of its jurisdiction. For by the act of 1782, prohibiting the formation of new states within her limits, under the severest penalties, every thing in relation to this very controversy was expressly excepted out of its provision.

The Connecticut settlers, then, prior to the decision at Trenton, upon principles well known and established in Pennsylvania by the legislature and the courts, had something of justice on their side—some sort of equitable claims to their possessions. The *commissioners* who investigated the subject at Trenton, admitted the equity of their claims, and recommended the consideration of their case by the legislature of Pennsylvania. The council of censors, as distinguished for virtue and talents as any body of men ever representing the people of Pennsylvania, urged the justice and equity of the claims upon the legislature. The legislature, by their acts before referred to, prior to 1787, recognised an equitable claim in the settlers; and by the confirming law of that year, did in fact confirm them in their possession. It is believed that, by this act, the legislature intended to go further than merely to recognise an *equitable claim* in the Connecticut settlers *within the seventeen townships*. An equitable right to their possessions seems intended to be recognised, and the considerations upon which that right was founded are clearly and specially set forth in the preamble. It is not known that this right was ever afterwards denied by the legislature, but on the contrary, it is believed to have been universally admitted. The only difficulty which seemed to present itself, was how this right could constitutionally be secured. At last the legislature adopted the expedient of acting as a mediator between the Connecticut and the Pennsylvania claimants, for the purpose of putting a final end to the controversy. The act of the 1st April 1799 was strictly an act of mediation. It proposed terms of compromise and settlement to the parties. Most fortunately, the terms proposed were embraced by the parties, and the controversy finally and happily settled. From the earliest period of this settlement, the possession of the Connecticut settler, upon his death, descended to his heirs. He disposed of it by will. It was mortgaged for the payment of his debts. It was

bound by judgments, and taken in execution and sold. It was transferred by deed. And it is a well known fact, that most of the certificates issued under the act of 1799 and its supplements, were predicated upon titles derived through some of the modes of conveyance.

If the foregoing views of the subject be correct, the conclusion follows, that the Connecticut settlers under the "Susquehanna Company," within the seventeen townships, acquired an equitable interest in the land, upon their making an improvement and permanent settlement thereon, and that as they enlarged their improvements, or contributed by personal services or otherwise to the defence of the country, this interest acquired increased strength; and that it was finally matured into a perfect and complete legal title, under the provisions of the act of 4th April 1799, and its supplements. It is admitted that the judges of the supreme court have, on several occasions, intimated a different opinion in strong and unequivocal language. But upon a review of all the cases which have arisen upon this title, it will be found, that in none did the facts and circumstances call for a decision upon this point.

In Carkuff *v.* Anderson, 2 *Binn.* 4, the question was, whether a judgment bound the land of a Connecticut settler after the passage of the act of 1799. It was held that it did. Judge Brackenridge, in delivering his opinion in the case, strongly intimates, that the Connecticut settlers had an equitable interest in the land prior to the passage of this law. In the case of Enslin *v.* Bornman et al., 6 *Binn.* 462, the dispute was between one in possession of lands in one of the seventeen townships, under a Pennsylvania title, and one claiming under Connecticut who had never been in possession of the land nor resided in the township. The Pennsylvania settler prevailed. In the case of Darley *v.* Avery, 4 *Serg. & Rawle* 281, the parties had both applied for the land under the act of 1799, as Connecticut claimants. The court held, that the certificate issued to one of the parties was conclusive between them. In the case of Satterlee *v.* Matthewson, 13 *Serg. & Rawle,* the land in controversy, it is believed, did not in fact lie within the seventeen townships. Nothing, therefore, which was said by the court in *relation to* the Connecticut title can have any application to the case under consideration. In the case of Long *v.* Seward, it was held by this court, at November term 1819, that a possession under a Connecticut title for twenty-one years, was a bar to a recovery under the statute of limitations, by one having the Pennsylvania title. The supreme court affirmed this opinion.

If then Joseph Hazard, on the 9th of May 1794, had an equitable claim, interest or right as a Connecticut settler, which finally ripened into a perfect and complete legal title to the land in question, under the laws of Pennsylvania, he might legally grant such an estate as is conveyed to William H. Smith by his deed of that date.

2. Is the certificate issued by the commissioners, under the act of 1799, to Joseph Hazard conclusive against the defendant's claims?

It is not understood that the defendant controverts the certificate or the plaintiff's *title to the land.*

He seeks to affirm the certificate. It is evidence of the very ground upon which the claims of both parties rest. Overthrow the certificate, and the defendant's estate falls with it. The defendant never did claim title to the land. He claims a right to enter upon it for certain specific purposes. An incorporeal hereditament and incumbrance upon the land, from which it never can be discharged by any mere transfer of the legal title.

This claim was not such as could be submitted to the commissioners under the act of 1799 and its supplements. They had no jurisdiction over it. They were to survey land. They were to class land. They were to decide upon titles to land. They were to certify land. They had nothing to do with incumbrances of any description upon land, nor could they legally disturb them. The principle decided in Carkuff *v.* Anderson, applies here; but the conclusiveness of a certificate between two Connecticut settlers, claiming title to the same land, as held in the case of Darley *v.* Avery, has no application to the point under consideration.

3. Was the record of the deed under which the defendant claims constructive notice of his title?

On the 25th of September 1786, Luzerne county was organized, offices were established, and the inhabitants vested with all the constitutional rights, powers and privileges exercised and enjoyed by the inhabitants of any other county in the state. No disability *existed* to prevent any man from conveying any interest he might have in the land either equitable or legal, from whatever source his title might have been derived; nor was there any law to invalidate such conveyance, its acknowledgement or its record. But on the 6th of April 1802, an act was passed declaring that no conveyance of land in the counties of Luzerne, Lycoming and Wayne should be effectual to pass any estate or right, legal or equitable, unless the title was derived from the state or proprietaries thereof before the declaration of independence, and unless such title was recited in such conveyance; and the acknowledgement and recording of such a conveyance, in which a title derived from Pennsylvania was not recited, subjected the officer to a forfeiture of 200 dollars; and such acknowledgement and recording it was declared should be void and of no effect. But the third section of this act expressly provides that these penalties and disabilities should not relate to lands within the seventeen townships in the county of Luzerne, so far as concerns any act of theirs concerning lands within the said seventeen townships which had been, or should thereafter be, duly submitted under the provisions of the act of the 4th of April 1799.

The land in controversy, or *locus in quo*, lies within the seventeen

townships, and was duly admitted under the act of 1799, as is testified by the certificate.

The conveyances under which the defendant claims, having been executed, acknowledged and recorded in the proper office, the record itself was constructive notice to all the world. The supreme court, in the case of Irish *v.* Scovell, say, that the manifest object of the act of the 6th of April 1802, appears to have been to continue the kindness which had been extended to the seventeen townships, but to cut up by the roots the title of Connecticut in all other parts.

4. Has the defendant lost his right by *non user?* Seventeen years had elapsed before the defendant attempted to avail himself of the privileges granted, and then he was resisted by the defendant. It does not appear that any suit was brought on any other proceedings had, in prosecution of the defendant's claim, until the lapse of another period of nineteen years, when the defendant again attempted to reap the benefits of his grant and was again prevented. For this last attempt this action of trespass is brought by the plaintiff to try the right.

The whole current of English authorities are against the defendant's claims upon this point. Analogy, which certainly is entitled to much consideration in settling the point, stamps a negative upon the question ; and the American cases, so far as they have been examined, are believed to fall short of the point contended for by the defendant ; but from the facts and the reasoning of the court in the case of Buty *v.* Ihrie, 1 *Rawle* 218, it is believed, that to negative the question under consideration would accord with the views of the supreme court upon the point of law involved. It is true, in the case of Buty *v.* Ihrie, the question arose upon a right reserved; but very little difference can be discovered, so far as regards the point at issue, between a right reserved and a right granted.

The court are, therefore, of opinion in favour of the defendant, and direct judgment to be entered in his favour for costs.

The opinion of the court, on all the points stated, was assigned for error.

*Conyngham* and *Lewis*, for plaintiffs in error.
*Woodward* and *Greenough*, for defendant in error.

PER CURIAM.—There is an objection not made, it would seem, in the court below, which is decisively fatal to the defendant's title.. It appears, from the original conveyance produced at the argument, that the probate of the deed by which he claims, was not authenticated by the seal of the justice, without which the probate is vicious and the recording void. To show that the seal is required, we have but to turn to the second and third sections of the act of 1715, by which it is made an integral part of the certificate of authentication ; the principle of which tacitly pervades all subsequent provisions, at least as regards authentication by justices of the peace. Indeed the

[Barney v. Sutton.]

act of the 30th of September 1791, the only additional law on the subject which was in force when this probate was taken, contains an express reference to the act of 1715, for the manner. That the seal or any other solemnity required, cannot be dispensed with, is shown by Friedley *v.* Hamilton, 17 *Serg. & Rawle* 70.(*a*) The registry of this deed, then, being a nullity, and the plaintiffs being purchasers without actual notice, are entitled to judgment under the terms of the agreement in the case stated.

Judgment of the court below reversed, and judgment entered here for the plaintiffs.

(*a*)   Duncan *v.* Duncan, 1 *Watts's Rep.* 322.—REPORTER.